NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARC DAWSON, | ) | No. C 08-00741 JF (PR) |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING MOTION |
| | ) | FOR SUMMARY JUDGMENT |
| vs. | ) | |
| | ) | |
| S. LATHAM, et al., | ) | |
| | ) | |
| Defendants. | ) | (Docket No. 31) |
| | ) | |

Plaintiff, a California prisoner, filed in pro se the instant civil rights action pursuant to 42 U.S.C. § 1983 against Pelican Bay State Prison ("PBSP") officials.  The Court found the complaint, when liberally construed, stated a cognizable claim of deliberate indifference to a serious medical need in violation of the Eighth Amendment. Defendants S. Latham, M. Edwards, and B. Jain filed a motion for summary judgment. Plaintiff filed opposition to Defendants' summary judgment motion, and Defendants filed a reply.  After reviewing the complaint and all submitted papers, the Court concludes that Defendants are entitled to summary judgment and will GRANT Defendants' motion.

///

///

**DISCUSSION**

**I.   <u>Standard of Review</u>**

Summary judgment is proper where the pleadings, discovery and affidavits show that there is 'no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 323.  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  But on an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325.  If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249-50.

The burden then shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex Corp.</u>, 477 U.S. at 324 (citations omitted).  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." <u>Id.</u> at 323.

The court's function on a summary judgment motion is not to make credibility

1   determinations or weigh conflicting evidence with respect to a disputed material fact.  See

2   T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

3   1987).  The evidence must be viewed in the light most favorable to the nonmoving party,

4   and the inferences to be drawn from the facts must be viewed in a light most favorable to

5   the nonmoving party.  See id. at 631.  It is not the task of the district court to scour the

6   record in search of a genuine issue of triable fact.  Keenan v. Allan, 91 F.3d 1275, 1279

7   (9th Cir. 1996).  The nonmoving party has the burden of identifying with reasonable

8   particularity the evidence that precludes summary judgment.  Id.  If the nonmoving party

9   fails to do so, the district court may grant summary judgment in favor of the moving

10  party.  See id.; see, e.g., Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026,

11  1028-29 (9th Cir. 2001).

12  **II.    Legal Claims and Analysis**

13      Plaintiff alleges that Defendants Latham, Edwards and Jain acted with deliberate

14  indifference to his serious medical needs in connection with wrong medication that was

15  administered to him on June 8, 2006, and the manner in which they treated the resulting

16  physical ailments he suffered thereafter.

17      **A.    Statement of Facts**

18      The following facts are undisputed unless otherwise indicated.  On June 8, 2006,

19  Defendant S. Latham, a prison pysch tech, came to Plaintiff's cell to deliver his usual

20  dose of Neurontin.  Immediately after swallowing the colorless liquid, Plaintiff realized

21  by the taste that it was not Neurontin.  Plaintiff told Defendant Latham that the medicine

22  he had just ingested was not Neurontin.  Defendant Latham believed it was Neurontin but

23  left the tier to check after Plaintiff insisted that it was not.  She returned approximately

24  fifteen minutes later with another dose of medication which she told Plaintiff was

25  Neurontin.  Plaintiff took the second dose.  Plaintiff does not allege that the second dose

26  was not Neurontin.  Plaintiff claims that about thirty minutes later, he began experiencing

27  "disorientation and sleepiness."  (Compl. at 5.)  Plaintiff slept for the rest of the day.

28      The following day, June 9, 2006, Plaintiff awoke when a correctional officer came

1    to escort Plaintiff to group therapy.  Plaintiff alleges that he felt disoriented, had blurry

2    vision particularly in his left eye, had "tense muscles," and "felt as if someone was

3    pushing down on his head."  (Id.)  Within minutes of arriving at group therapy, Plaintiff

4    notified prison staff of his symptoms, and Plaintiff was immediately escorted to the

5    nurse's office.  Plaintiff was examined by Dr. Hutchinson, who is not a party to this

6    action, in the presence of Defendant Latham.  Plaintiff alleges that he told Dr. Hutchinson

7    about the medication incident from the day before, and that Dr. Hutchinson asked

8    Defendant Latham to identify the first dose of medicine which Plaintiff ingested.  Plaintiff

9    alleges that Defendant Latham was unable to identify the medication, and that she

10   informed Dr. Hutchinson that the bottle had been discarded.  Dr. Hutchinson prescribed

11   Benadryl and bed rest for Plaintiff.  Plaintiff alleges that the rest of June 9, 2006, was

12   "foggy."  (Id. at 6.)

13          On June 10, 2006, the next day, Plaintiff awoke still feeling the effects of the extra

14   medication.  Plaintiff alleges that he felt "constant pressure pushing down on his head,"

15   muscle spasms, blurred vision and a severe headache.  (Id.)  Plaintiff alleges that he was

16   seen by Nurse Kirkpatrick, who is not a party to this action.  According to Plaintiff, Nurse

17   Kirkpatrick became concerned after taking Plaintiff's vital signs, and ordered Plaintiff to

18   be taken to the Critical Treatment Center ("CTC").  (Id. at 7.)  At CTC, Plaintiff was

19   examined by Defendant Nurse Edwards, who prescribed more Benadryl and bed rest.

20   Defendant Edwards advised Plaintiff that she would put him on the next sick-call list.

21   Plaintiff alleges that Defendant Edwards refused to draw blood for tests, believing it was

22   unnecessary.  (Id. at 8.)  On the same day, the first dose of medication that Plaintiff was

23   given on June 8, 2006, was identified as Haldol, which is an antipsychotic medication

24   used in the treatment of schizophrenia, and more acutely, in the treatment of acute

25   psychotic states and delirium.  (Defs.' Mot. at 4.)  Haldol can cause sleepiness, dizziness

26   and blurred vision.  (Id.)

27          The next sick-call list was June 13, 2006, but for unknown reasons, Plaintiff was

28   taken off the list.  Plaintiff alleges for the first time in opposition that the next sick-call

1   list was June 12, 2006, according to the notation on a "Interdisciplinary Progress Notes"

2   by Defendant Edwards.  (Oppo. at 19, Ex. P.)  However, by Plaintiff's own admission,

3   sick-call takes place only on Tuesdays and Thursdays, which means that as of June 10,

4   2006, the next sick-call day was Tuesday, June 13, 2006.  There is no evidence to show

5   that Defendants were responsible for Plaintiff's removal from the sick-call list for June

6   13, 2006.  Although Plaintiff alleges again for the first time in opposition that Defendant

7   Dr. Jain had to be responsible for the removal because she was the doctor on June 13,

8   2006, (Oppo. at 19), there is no evidence in the record to support this conclusory

9   allegation.

10       On June 15, 2006, the following sick-call day, Plaintiff was examined by

11  Defendant Dr. B. Jain.  Plaintiff alleges that Defendant Jain inaccurately noted his

12  symptoms in her medical report, such as the notation that his right eye was twitching

13  which Plaintiff denies ever complaining of and the characterization of his rigid muscle in

14  his back as simply a "tight lump in the back of head."  (Compl. at 9-10.)  Defendant Jain

15  ordered Plaintiff to continue to take Benadryl and ordered an optometry evaluation and

16  blood tests for Haldol and Artane, which is an antispasmodic drug that can also cause

17  blurred vision.  (Defs.' Mot. at 4.)  The blood tests were performed the next day, June 16,

18  2006, and revealed that both substances were present in trace amounts.  (Id.)  Defendant

19  Jain followed up on these results with Plaintiff on June 22, 2006.

20       On June 23, 2006, Plaintiff received the eye examination ordered by Defendant

21  Jain.  The results were a mild correction for farsightedness, *i.e.*, Plaintiff needed reading

22  glasses, with no other reported vision problem.

23       **B.    Deliberate Indifference**

24       Deliberate indifference to serious medical needs violates the Eighth Amendment's

25  proscription against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97,

26  104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other

27  grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en

28  banc); Jones v. Johnson, 781 F.2d 769, 771 (9th Cir. 1986).  A determination of

1   "deliberate indifference" involves an examination of two elements: the seriousness of the

2   prisoner's medical need and the nature of the defendant's response to that need.  See

3   McGuckin, 974 F.2d at 1059.

4        A "serious" medical need exists if the failure to treat a prisoner's condition could

5   result in further significant injury or the "unnecessary and wanton infliction of pain."

6   McGuckin, 974 F.2d at 1059 (citing Estelle, 429 U.S. at 104).  The existence of an injury

7   that a reasonable doctor or patient would find important and worthy of comment or

8   treatment; the presence of a medical condition that significantly affects an individual's

9   daily activities; or the existence of chronic and substantial pain are examples of

10  indications that a prisoner has a "serious" need for medical treatment.  Id. at 1059-60

11  (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

12       A prison official is deliberately indifferent if he knows that a prisoner faces a

13  substantial risk of serious harm and disregards that risk by failing to take reasonable steps

14  to abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The prison official must not

15  only "be aware of facts from which the inference could be drawn that a substantial risk of

16  serious harm exists," but he "must also draw the inference."  Id.  If a prison official

17  should have been aware of the risk, but was not, then the official has not violated the

18  Eighth Amendment, no matter how severe the risk.  Gibson v. County of Washoe, 290

19  F.3d 1175, 1188 (9th Cir. 2002).

20       In order for deliberate indifference to be established, therefore, there must be a

21  purposeful act or failure to act on the part of the defendant and resulting harm.  See

22  McGuckin, 974 F.2d at 1060; Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d

23  404, 407 (9th Cir. 1985).  A finding that the defendant's activities resulted in "substantial"

24  harm to the prisoner is not necessary, however.  Neither a finding that a defendant's

25  actions are egregious nor that they resulted in significant injury to a prisoner is required to

26  establish a violation of the prisoner's federal constitutional rights, McGuckin, 974 F.2d at

27  1060, 1061 (citing Hudson v. McMillian, 503 U.S. 1, 7-10 (1992) (rejecting "significant

28  injury" requirement and noting that Constitution is violated "whether or not significant

1    injury is evident")), but the existence of serious harm tends to support an inmate's

2    deliberate indifference claims, Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing

3    McGuckin, 974 at 1060).

4         A claim of medical malpractice or negligence is insufficient to make out a

5    violation of the Eighth Amendment.  See Toguchi v. Chung, 391 F.3d 1051, 1060-61 (9th

6    Cir. 2004); Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002);  Franklin v. Oregon,

7    662 F.2d 1337, 1344 (9th Cir. 1981); see, e.g., Frost v. Agnos, 152 F.3d 1124, 1130 (9th

8    Cir. 1998) (finding no merit in claims stemming from alleged delays in administering pain

9    medication, treating broken nose and providing replacement crutch, because claims did

10   not amount to more than negligence); McGuckin, 974 F.2d at 1059 (mere negligence in

11   diagnosing or treating a medical condition, without more, does not violate a prisoner's 8th

12   Amendment rights); O'Loughlin v. Doe, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly

13   failing to satisfy requests for aspirins and antacids to alleviate headaches, nausea and

14   pains is not constitutional violation; isolated occurrences of neglect may constitute

15   grounds for medical malpractice but do not rise to level of unnecessary and wanton

16   infliction of pain); Anthony v. Dowdle, 853 F.2d 741, 743 (9th Cir. 1988) (no more than

17   negligence stated where prison warden and work supervisor failed to provide prompt and

18   sufficient medical care).

19        Applying these principles to the instant case, the Court concludes that Plaintiff's

20   claims against Defendants are appropriate for summary judgment.  First of all, there is no

21   genuine issue of material fact as to Plaintiff's claim that the various ailments he suffered

22   due to the single overdose of Haldol constituted a "serious" medical condition, see

23   McGuckin, 974 F.2d at 1059-60.  Furthermore, there is no evidence to support Plaintiff's

24   claim that Defendants acted with deliberate indifference and consciously disregarded an

25   excessive risk to Plaintiff's health in the treatment they provided after the overdose.  See

26   Farmer, 511 U.S. at 837.

27        In support of their motion, Defendants have submitted the declaration of

28   Defendant S. Latham.  (See Defs.' Mot. Attach. 3; Latham Decl.)  Defendant Latham

1    states that she believed that the first dose of medicine that she gave to Plaintiff on June 8,

2    2006, was Neurontin.  (Latham Decl. at 2.)  Plaintiff concedes in his opposition that the

3    medication error was "accidental" and that "no intent exists."  (Oppo. at 22.)  Plaintiff

4    does not dispute that Defendant Latham later gave Plaintiff his regular prescribed dosage

5    of Neurontin.  Based on these facts, this isolated incident by Defendant Latham

6    administering a single dose of wrong medication amounts to nothing more than

7    negligence, which is not sufficient to make out a violation of the Eighth Amendment.  See

8    Toguchi, 391 F.3d at 1060-61; O'Loughlin, 920 F.2d at 617.  Furthermore, there is no

9    evidence to suggest that Defendant Latham knew or should have known that Plaintiff

10   faced a "substantial risk of serious harm" since Plaintiff slept the rest of the day on June

11   8, 2006, and did not appear to be in any distress.  Accordingly, it cannot be said that

12   Defendant Latham failed to take reasonable steps to abate a "substantial risk of serious

13   harm" where none was apparent.  See Farmer, 511 U.S. at 837.

14        Defendants have also submitted the declaration of Dr. Jeff Gould, a board-certified

15   psychiatrist and neurologist, who has reviewed Plaintiff's medical history to render a

16   professional opinion about the overdose of medication Plaintiff received, the alleged

17   resulting harm, and the quality of medical care rendered thereafter.  (See Defs.' Mot.

18   Attach. 2; Gould Decl.)  Dr. Gould concludes that Plaintiff's condition following the

19   overdose, which he characterizes as being "groggy and uncomfortable," was not serious.

20   (Id. at 2.)  Plaintiff continued to feel the effects of the overdose for several days, but he

21   concedes that his symptoms were improving by the time he met with Defendant Jain.

22   (Oppo. at 19.)  Accordingly, the Court finds that Plaintiff's physical ailments, which were

23   temporary and insubstantial, were not of the type that significantly affected his daily

24   activities or constituted chronic and substantial pain to warrant a "serious" need for

25   medical treatment.  McGuckin, 974 F.2d at 1059-60; see e.g., O'Loughlin v. Doe, 920

26   F.2d at 617.

27        Furthermore, there is no evidence in the record to indicate that Defendants

28   unreasonably delayed in providing treatment for Plaintiff's medical needs, assuming they

1    were serious.  When Plaintiff notified prison officials about feeling unwell the day after

2    the overdoses, he was promptly taken to the prison clinic where he was examined by a

3    physician against whom Plaintiff makes no allegation of wrongdoing.  After examining

4    Plaintiff, Dr. Hutchinson found no reason to prescribe anything other than Benadryl and

5    bed rest.  When the symptoms persisted the next day, prison official again responded

6    promptly with medical attention by taking Plaintiff to the CTC where he was examined

7    by  Defendant Edwards.  The examination revealed that Plaintiff was in no apparent

8    distress: Plaintiff's vital signs were stable; his heart rate, blood pressure, respiration and

9    temperature were normal; his skin was cool and dry; his skin color was normal; and his

10   responses as registered on the Glasgow Coma Scale were normal.  (Id. at 3.)  Plaintiff

11   disputes the report as inaccurate, claiming that Nurse Kirkpatrick's observations of

12   Plaintiff's vital signs at the time were "not within normal range."  (Oppo. at 24.)

13   However, Plaintiff has offered up no evidence by way of a declaration or other medical

14   report to support this hearsay testimony as to Nurse Kirkpatrick's observations.  Plaintiff

15   also alleges that Defendant Edwards refused to draw blood because she felt it was

16   unnecessary, and that the only thing she prescribed was more Benadryl and bed rest.  This

17   allegation is insufficient to show that she acted with deliberate indifference because "[a]

18   difference of opinion between a prisoner-patient and prison medical authorities regarding

19   treatment does not give rise to a § 1983 claim."  Franklin v. Oregon, 662 F.2d 1337, 1344

20   (9th Cir. 1981).  Similarly, a showing of nothing more than a difference of medical

21   opinion as to the need to pursue one course of treatment over another is insufficient, as a

22   matter of law, to establish deliberate indifference, see Toguchi, 391 F.3d at 1058, 1059-

23   60.  Furthermore, there was no evidence to show that Defendant Edwards knew or should

24   have known that Plaintiff faced a "substantial risk of serious harm" since her examination

25   revealed that Plaintiff's vital signs were normal.  Accordingly, it cannot be said that

26   Defendant Edwards failed to take reasonable steps to abate a "substantial risk of serious

27   harm" where none was apparent.  See Farmer, 511 U.S. at 837.  Defendant Edwards did

28   not purposely act or fail to act in response to Plaintiff's medical needs as she examined

1   him when he came to CTC, prescribed treatment, and placed Plaintiff on the next sick-call

2   list to be seen by a physician.  See McGuckin, 974 F.2d at 1060.

3          In his opposition, Plaintiff makes much of the fact that the medical records state

4   that the first dose of medication was identified as Haldol on June 10, 2006, even though

5   Defendant Latham had stated that she did not know what the medicine was and that she

6   had disposed of the bottle the day before.  However, this inconsistency is not significantly

7   probative on the issue of whether Defendants acted with deliberate indifference to

8   Plaintiff's medical needs.  It is undisputed that Plaintiff received medical attention as

9   soon as he alerted prison staff to his physical ailments the following day, and that he

10  continued to receive care in the days thereafter when his complaints persisted.

11  Furthermore, the blood tests confirmed the presence of trace amounts of Haldol in

12  Plaintiff's system, which is consistent with the identification of the unknown medication

13  on June 10, 2006, according to the medical records.

14         With respect to the alleged damage to Plaintiff's vision, Dr. Gould notes that the

15  medical records show some differences in Plaintiff's pupils and pupillary response

16  between the right and left eyes but accounts for the difference as normal or due to a

17  previous injury to the right eye which Plaintiff concedes resulted in some permanent

18  damage.  (Id.) (Oppo. at 24.)  Dr. Gould concludes that Plaintiff's claim of permanent eye

19  damage due to the medication is medically improbable.  The blurry vision can be

20  accounted for by the dose of Haldol which can cause sleepiness, dizziness and blurred

21  vision.  (Id. at 4.)  According to Dr. Gould, Haldol has a half-life of 21 to 24 hours when

22  administered orally, which means that after a single dose like the one Plaintiff received,

23  its side effects would generally not be expected to last more than 24 hours.  Dr. Gould

24  states that in his own personal practice and in his review of medical literature, he has

25  found no reports of cases where any amount of Haldol resulted in permanent vision

26  damage.  (Id.)  Lastly, Dr. Gould states that "[c]ombining Haldol and Neurontin would

27  not increase or affect in any way the serious side effects of either, although it is possible

28  that the intended sedative affects of both might have lasted longer in combination, which

1    the records seem to bear out."  (Id. at 4.)  Although the question of whether the overdose

2    was the direct cause of Plaintiff's blurry vision is a material fact, the Court finds that

3    there is no genuine dispute over this material fact because the evidence presented is not

4    such "that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>,

5    477 U.S. at 248.

6            Lastly, with respect to the treatment Defendant Jain provided Plaintiff, the bulk of

7    Plaintiff's allegations involve disagreements with how Defendant Jain documented

8    Plaintiff's complaints in her medical report, copies of which he received on June 21,

9    2006.  (Compl. at 9-10.)  Plaintiff was seen by Defendant Jain as scheduled on June 15,

10   2006.  Defendant Jain ordered the blood tests which Plaintiff had been seeking, as well as

11   an urine analysis.  Defendant Jain informed Plaintiff of the results of these tests on June

12   22, 2006.  Plaintiff claims that Defendant Jain misinformed him that the results were

13   "negative" when the actual test results showed that there were still trace amounts present.

14   However, even assuming that Defendant Jain gave incorrect information to Plaintiff, this

15   fact alone does not constitute deliberate indifference since these trace amounts did not

16   warrant further medical attention; the amounts were "out of range" and otherwise

17   undetectable.  (Gould Decl., Ex. F.)  Defendant Jain also provided treatment for

18   Plaintiff's blurry vision with an opthalmogic examination on June 23, 2006.  Lastly,

19   Defendant Jain's alleged refusal to refer Plaintiff to a specialist is also without merit since

20   a difference of opinion as to the course of treatment does not give rise to a § 1983 claim.

21   See <u>Franklin</u>, 662 F.2d at 1344; <u>see Toguchi</u>, 391 F.3d at 1058, 1059-60.

22           Having reviewed the pleadings and all submitted papers on this matter, the Court

23   finds that Plaintiff's allegations do not establish that Defendants acted with deliberate

24   indifferent to his serious medical needs.  Accordingly, Defendants are entitled to

25   judgment on this claim as a matter of law.  See <u>Celotex Corp. v. Cattrett</u>, 477 U.S. 317,

26   323 (1986).

27   ///

28   ///

1

**CONCLUSION**

2     For the foregoing reasons, Defendants S. Latham, M. Edwards, and B. Jain's

3   motion for summary judgment (Docket No. 31) is GRANTED.

4     Defendants Morgan and McLean's motion for summary judgment is DENIED as

5   unnecessary.  All claims against these defendants were dismissed in an earlier order, and

6   they are no longer parties to this action.  (See Docket Nos. 6 & 8.)

7     IT IS SO ORDERED.

8   DATED: _____9/23/09_____     _____
                                              JEREMY FOGEL
9                                             United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


MARC C DAWSON,

              Plaintiff,

  v.

S LATHAM, et al.,

              Defendants.

_____/

Case Number: CV08-00741 JF

**CERTIFICATE OF SERVICE**


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on ___9/28/09_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.



Marc Charles Dawson P13296
High Desert State Prison
P.O. Box 3030
B3-209L
Susanville, CA 96127-3030


Dated: ___9/28/09_____

                            Richard W. Wieking, Clerk